**In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.**

**MDL No. 381.**

United States District Court,
E.D. New York.

June 29, 1983.

Victor J. Yannacone, Jr., Yannacone & Associates, Patchogue, N.Y., for plaintiffs.

Leonard L. Rivkin, Rivken, Leff, Sherman & Radler, Garden City, N.Y., for defendant The Dow Chemical Corp.

Morton B. Silberman, Clark, Gagliardi & Miller, White Plains, N.Y., for defendant T.H. Agriculture & Nutrition Company, Inc.

Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, New York City, for Diamond Shamrock.

Philip D. Pakula, Townley & Updike, New York City, for defendant Monsanto.

. William Krohley, Kelley Drye & Warren, New York City, for defendant Hercules, Inc.

Thomas Beck, Arthur, Dry & Kalish, New York City, for defendant Uniroyal.

Howard Lester, Lester, Schwab, Katz & Dwyer, New York City, for defendant Hoffman-Taft.

John M. Fitzpatrick, Dilwarth, Paxson, Kalish & Levy, Philadelphia, Pa., for defendant Hooker Plastics & Chemicals Corp.

David R. Gross, Budd, Larner, Kent, Gross, Picillo & Rosenbaum, Newark, N.J., for defendant Thompson Chemical Co.

Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill., for defendant Riverdale Chemical Co.

Arvin Maskin and Gretchen Leah Witt, Civil Division, Department of Justice, Washington, D.C., for the United States of America.

Pretrial Order No. 53

GEORGE C. PRATT, Circuit Judge:*

By report dated June 8, 1983 (attached as an appendix), special master Sol Schreiber made certain recommendations with respect to defendants' motions for an order compelling production of: (I.) NCI/Bionetics documents; (II.) Interdepartmental Committee documents; (III.) Public Health Service documents; (IV.) Department of Agriculture documents; and (V.) Department of Defense documents. He also addressed defendants' request for discovery from the National Security Agency (NSA). Defendants submitted timely objections to the report.

Even although in pretrial order No. 26 the court granted summary judgment dismissing all claims against the government, 506 F.Supp. 762, counsel for the government has cooperated fully in the production of documents and witnesses during the past twelve months. Thousands of documents have been produced, and numerous government employees, present and former, have appeared for depositions. The government opposes the instant motions on the grounds that the items requested do not exist, the materials requested have already been produced, and/or the defendants' requests lack

* Of the U.S. Court of Appeals for the Second Circuit, sitting by designation.

the specificity necessary to enable the government to comply.

The court has examined defendants' memorandum submitted to this court, as well as the memoranda submitted to the special master in support of the motions to compel, and has carefully considered defendants' arguments and those set forth by the government in its papers. The special master's recommended order is adopted with several minor modifications.

There appears to have been some misunderstanding with respect to requests for "personal files" of former government employees. Defendants claim they were initially ordered to address requests for such files to the government, not to the individuals concerned; now, they complain, the special master has denied their requests because they were directed to the government and not to the individuals. As the court understands the problem, it focuses upon what is meant by the term "personal files". The court is confident that the special master did not intend to create a "Catch 22" situation which would automatically bar defendants from access to anything that might be called "personal files", whether they be files in the possession of the government that were maintained personally by former employees, or files in the possession of and belonging to former government employees that were developed during the course of their government employment.

Whether or not defendants would be entitled to any such files cannot be determined on the papers before the court. What can be determined is that their requests have not been addressed on the merits, but have been sidetracked by the misunderstanding indicated above. The special master shall reconsider this matter and make appropriate rulings.

With respect to the government's search of the personal files of individuals who served in member agencies of the Federal Committee on Pest Control (FCPC), the relevant time period is expanded to cover 1960 to 1970.

Request No. 4 to the Department of Defense was denied, apparently on the ground that the requested documents were included in the TWIX inventories. Defendants argue that, as to the items in Request No. 4 particularly, they were not identified in the TWIX inventories, and that even if they were, the identification was of a general, unrevealing nature. Since these particular documents have already been located and segregated by the government, and since they strike close to the heart of the government contract defense, the special master should reconsider Request No. 4 to determine more precisely whether defendants' failure to pursue the documents in that request through the TWIX inventory should prevent them from discovering those documents at this time, when the documents are readily available and the urgency of the impending trial on the government contract defense has passed.

With respect to defendants' request that the special master review *in camera* the three NSA documents identified in Dow's Freedom of Information Act (FOIA) suit, *Rivkin, Leff, Sherman & Radler v. Central Intelligence Agency*, No. 82 CV 3721, such review is not necessary because the court has already examined these documents in connection with that suit and has upheld the government claim of privilege. Moreover, viewing those three documents in light of this discovery request instead of that FOIA request, they still should not be produced. None of the three documents contains any information even remotely relevant to the issues of this case that is not already readily available to all parties. As indicated in this court's decision in the FOIA matter, the government's reluctance to disclose these three documents grows from its concerns over preserving the secrecy and integrity of its communications-monitoring capability and is not related in any way to Agent Orange. The court agrees with the special master that further discovery of NSA documents is not appropriate.

With respect to a number of the agency searches, defendants request that they be supplied with a detailed, specific affidavit covering the scope and intensity of the search. The court requests the special mas-

ter to consider whether such a detailed affidavit is needed for any of the agencies. That determination requires a more intimate knowledge of what has happened and of the government's responses to the many requests that have been made here than is possessed by the court.

■ In at least one instance raised by defendants on the appeal from the special master's recommendation, it would seem that some additional detail is required. The general search initially conducted by the government produced none of the 17 quarterly progress reports prepared in the course of the Bionetics study. After defendants obtained copies of the reports from other sources, the government produced some of them. All but three of the reports have been uncovered by the defendants, but numbers 1, 2, and 3 are still missing. Unless there are circumstances which do not appear in the papers, it would seem that the government should at least account for a more detailed search for those particular reports. Whether the circumstances would warrant more details with respect to the other matters, the court leaves to the special master's discretion after he has re-evaluated the situation.

SO ORDERED.

## APPENDIX

## SPECIAL MASTER'S RECOMMENDED ORDER AND MEMORANDUM RE:

Defendants' Motions for an Order to Compel Production of:

I. NCI/Bionetics Documents

II. Interdepartmental Committee Documents

III. Public Health Service Documents

IV. Department of Agriculture Documents

V. Department of Defense Documents

AND RE:

VI. Defendants' Request for Discovery from The National Security Agency

SOL SCHREIBER, Special Master.

Pursuant to my duties as Special Master in this multi-district litigation (See 94 F.R.D. 173, 174 (E.D.N.Y.1982)), for the past year I have been overseeing discovery on issues presented by the government contract defense which was to be tried in the Phase I trial of this case. For a summary of these issues see the Special Master's Memorandum in Support of a Recommended Protective Order Governing Environmental Protection Agency Documents, dated December 21, 1982. On May 12, 1983, in the course of ruling on various defendants' summary judgment motions, Judge Pratt indicated that in addition to continuing discovery on the government contract defense which had been scheduled for trial on June 27, 1983, the parties would also prepare for trial issues concerning general causation. See Pretrial Order Number 51, dated May 20, 1983 at 39. He further stated that a single trial combining what remains of the government contract defense with issues of liability and general causation would be scheduled at the earliest reasonable date. *Id.* By this order, Judge Pratt also reaffirmed the authority of the Special Master to supervise discovery of this action, and specifically directed me "to recommend an appropriate timetable for the remaining discovery, any further motions, preparation of a pretrial order, and trial." Accordingly, as I have done for the past year, I will continue to issue formal written reports and recommendations where appropriate concerning certain discovery disputes. I will resolve other disputes, as I have in the past, by oral direction at periodic hearings. This memorandum examines six major disputes as listed in the caption above.

Under the expedited discovery in this case, the government has produced a voluminous number of documents from many of its agencies. However, the defendants cite areas where the government has failed to respond to their discovery requests or has responded inadequately. In the past few months defendants have made six major motions to compel government document production. My recommendations on the first of these, which sought to compel pro-

duction of Food and Drug Administration documents, were made in an Order and Memorandum dated March 17, 1983.

Following are my recommendations on the other five motions for orders to compel document production from the government and on one new request for document production.

### I. Defendants' Motion for an Order to Compel Production of NCI/Bionetics Documents

Defendants' Motion for an Order to Compel Production of National Cancer Institute/Bionetics Research Laboratories, Inc. Documents requests production of all documents relevant to the Agent Orange litigation which relate to the contract between the National Cancer Institute ("NCI") and Bionetics Research Laboratories ("Bionetics"). Pursuant to this contract Bionetics conducted a study evaluating "toxicology, teratogenicity and carcinogenicity of, *inter alia*, 2,4,5–T". (Defendants' Memo in Support of Motion to Compel Production of NCI and Bionetics Documents, at 1). Defendants contend that the government has failed to produce the requested NCI/Bionetics documents.

In response, the government represents that the National Institute of Health ("NIH"), which oversees its component institutes of. which NCI is one, determined that only the files of the National Institute of Environmental Health Sciences ("NIEHS") and of NCI could reasonably be expected to contain the information defendants seek.[1] (See Affidavit of Joanne Belk attached to Government's Memorandum in Opposition to Defendants' Motion to Compel NCI and Bionetics Documents). In its papers the government states that NIEHS has conducted one full search for documents relevant to this litigation; according to the government, NIEHS officials searched all correspondence, and research reports files to collect all documents relating to 2,4–D,

2,4,5–T, TCDD, dioxin and herbicides. The search resulted in production of approximately 1066 documents totalling over 19,000 pages which the government asserts it made available on microfilm in September 1980. According to the government, a second sweep through NIEHS files revealed no additional material. Further, the government states that in September 1982 a computer check, run on NCI files to ensure that all relevant files had indeed been transferred to NIEHS and produced, revealed no new material. However, at this time NCI did uncover in its own files, approximately 1000 pages of relevant documents.[2] NCI sent this material to the Department of Justice incorrectly indicating that the materials related to the President's working group on pesticide control. The government first became aware of this error when defendants brought this motion and has since informed defendants of its mistake.

■ I have carefully considered the written submissions of both the defendants and the government. The government represented to the court that NIEHS searched its files for all material referring to "2,4–D, 2,4,5–T, TCDD, dioxin and herbicides" and that NCI searched its files for material referring to "Agent Orange, 2,4,5–T, chloracne, dioxin and pesticide studies." (See Affidavit of Joanne Belk at 2). Items # 2–6, 9, 11, 12 and 13 on defendants' list of requests for NCI/Bionetics documents (see "NCI/Bionetics List of Requests" attached hereto as Appendix A) make explicit reference to 2,4,5–T. To the extent they would require the government to search the same files again for various reports and documents referring to 2,4,5–T, the requests are denied. In view of the criteria used by the government in its initial search, to require a second search of the same files utilizing one of the same criteria would be

---

1. According to the government, NIEHS files are relevant because the program functions of NCI having authority over the Bionetics study were transferred to NIEHS in January 1969, and consequently, material relevant to Bionetics was transferred from NCI files to NIEHS.

2. This material includes indices from the Bionetics Research reports, a teratology study and two volumes of the final Bionetics Report.

duplicative and wasteful at a time when the parties ought to be narrowing the focus of discovery.

In her affidavit, Ms. Belk represents that the computer search made of NCI files in 1982 earmarked a contract between NCI and Litton, Bionetics and that material relating to the contract was thereafter produced. In light of this and because the criteria used by NCI and NIEHS in searching their files encompasses the subject matter of any contract between NCI and Bionetics which would be relevant to this litigation, a search of the same files for such material would be duplicative. Accordingly, Item # 1 is denied.

To the extent that Item # 4 relates to documents in the possession of Bionetics, such a request is stricken as improper in a motion to compel production from the government.

With respect to Items # 12–16, the government represents that these are new requests to which they have not had an opportunity to respond. Although Rule 37 does not anticipate requests for orders compelling production where there has not been a prior request for documents, to avoid delay, I will rule on those requests at this time. As indicated above, Items # 12 and 13 are denied because they relate to 2,4,5–T, and therefore were included in the government's earlier search. To the extent that Item # 12 and Item # 14 request documents in the possession of Dr. Baker, a former government employee, the requests are denied as improper in a motion to compel production from the government. Also, with respect to Item # 14, the Belk affidavit represents that those of Dr. Baker's files which are in the possession of the NIH were searched. A second search of the same files would be duplicative. Following the same reasoning, Item # 16, requesting Dr. Fishbein's files, is denied.

Items # 7, 8, 10 and 15 are denied. These requests are too general and broad in nature and scope and would not further the discovery process.

I recommend that the government be directed to copy and produce, to the extent it has not already done so, those records from Dr. Courtney's files which defendants selected in North Carolina in January of 1983.

In oral argument on their motion to compel NCI/Bionetics documents, the defendants raised, for the first time, the question whether the search for Bionetics/NCI material was conducted at organizational levels in The Department of Health Education and Welfare ("HEW") (now Department of Health and Human Services ("HHS")) above the NIH level. See transcript of the April 11, 1983 hearing ("Tr.") at 4091–95. Government knowledge is a crucial issue with respect to the third element of the government contract defense. Defendants contend that knowledge received at any level of government ought to be sufficient proof of government knowledge (See Tr. at 4093). However, defendants argue as an alternative that it may be necessary for them to show that information was transmitted from lower to higher levels in the government. (See Tr. at 4073 and 4091.)

In view of the defendants' raising the issue of transmission of knowledge to high levels of government, I urged them at the April 11, 1983 hearing to begin taking depositions of those people who were Secretaries and Under-Secretaries of HEW during the relevant time period, 1962–1969. At the same hearing, I directed government counsel to determine whether or not a search had been made in the files of the high level officials for information responsive to defendants' discovery requests. Pursuant to my direction, the government searched these HEW files at the Secretary, Under-Secretary, Surgeon General and Assistant Secretary of Health levels for material which related in any way to dioxin, TCDD, 2,4,5–T, Agent Orange, chloracne, trichlorophenol, or the toxicity thereof, chick edema and also for material which related to the contract between NCI and Bionetics. At the May 3, 1983 hearing, the government's counsel stated that the only relevant documents uncovered by this search were three located in the Surgeons' General files (see transcript of May 3, 1983 hearing at 4796). These have been sent to the Department of

Justice for review and microfilming, and should be produced shortly.

## II. Defendants' Motion for an Order to Compel Interdepartmental Committee Documents

Defendants' Motion to Compel Interdepartmental Committee Documents refers to requests for documents from the Interdepartmental Committee on Pest Control ("ICPC"), The Federal Pest Control Review Board ("FPCRB") and The Federal Committee on Pest Control ("FCPC"). The ICPC was established in 1940 and continued to exist into the early 1960's. The FPCRB existed from 1961 to 1964 and was succeeded by the FCPC which continued to exist until the 1970's. These committees were created to provide for the sharing of information among various federal agencies involved in pesticide and herbicide use. Member agencies of the FCPC, for example, included the Department of Defense and the Department of Agriculture. Defendants' motion contains three broad requests—each one directed at one of these three committees—for "all written minutes, agendas, reports or other documents relating to herbicides, dioxin and/or any health hazards posed by exposure to chlorinated hydrocarbons".

Defendants assert that requests for these documents were contained in their first-wave interrogatories and in a letter dated September 9, 1982.[3] The September letter sought, inter alia, FCPC documents which were identified by Dr. William M. Upholt, during his August 4, 1982 deposition. Dr. Upholt stated his belief that the FCPC documents and those of its successor, the Federal Working Group on Pest Control Management, were at the EPA in 1977 when he retired. He also suggested that the Armed Forces Pest Control Board was a possible source of documents concerning the Department of Defense herbicide programs reviewed by FCPC.

In her affidavit submitted in support of the government's papers, Patricia Roberts, Office of the General Counsel of the Environmental Protection Agency ("EPA"), detailed the search conducted by EPA in response to defendants' September 9, 1982 letter. The EPA contacted people suggested by Dr. Upholt and learned from someone at the Scientific Advisory Panel that, while some of the FCPC documents had been archived, others had been thrown away. EPA searched its files, and by letter dated November 11, 1982, the Department of Justice informed defendants that it had located three boxes of FCPC material which would be reviewed for documents relating to "2,4,-5-T, 2,4-D, phenoxy and chlorophenoxy herbicides, TCDD, dioxin, Agent Orange, defoliant use in Vietnam and the Bionetics study". The relevant documents were reproduced on microfilm and made available to the parties early in January 1983. In addition, the government represents that the Armed Forces Pest Control Board has completed a computer check of its files for material responsive to defendants' requests. That search turned up a small number of FCPC documents which the government has produced on microfilm as Batch Number 2015, roll 283.

The government maintains that its searches have been conducted in those places where it is reasonable to expect the requested material to be located, and that no ICPC or FPCRB documents have been found. Defendants question the adequacy of the government's search by pointing to the fact that their own investigation yielded one ICPC document.[4] They suggest that I direct the government to search the files of the member agencies of each of these three committees (the ICPC, FPCRB and FCPC). In view of the fact that each committee had at least four member agencies and one or another of the agencies existed

---

3. In addition to these formal requests, counsel for defendant-Dow Chemical Company has attempted to get these documents through the Freedom of Information Act ("FOIA") on two different occasions; each time they were informed that the documents no longer existed.

4. According to the defendants, this document was produced pursuant to a FOIA request on the Army Environmental Health Agency ("AEHA").

over a twenty-year period, it is unreasonable to require the government to embark on a search of that magnitude when the likelihood of finding material which falls within even the outermost limits of the zone of relevancy is slight. Instead, at oral argument, I requested that the defendants report to me whether they have previously requested the same files through FOIA requests. Further, I directed that the government search the personal files of those individuals of member agencies of the FCPC who served from 1964 to 1967. If these are found to exist and if they yield relevant documents, then defendants may renew their request to have the government search the member agencies of ICPC and FPCRB for files of individuals who served on those two committees. The defendants have provided the government, by letter dated May 6, 1983, with the names of the individuals in FCPC from 1964 to 1970; in view of my direction that the relevant time period for this search is 1964 to 1967, the defendants are directed to provide the government with a second list which contains the names of individuals who served only during the relevant time period. Upon receipt of this list, the government will commence its search.

### III. Defendants' Motion for an Order to Compel Production of Public Health Service Documents

Defendants claim that production of documents from Public Health Service ("PHS") is important and relevant based on testimony obtained in the depositions of Donald Birmingham (a former PHS official), Marcus Key (Assistant Chief Dermatologist at PHS in 1963) and David Groth (a pathologist at PHS). According to defendants, this testimony established that PHS was aware by 1969 that chloracne was associated with the production of 2,4,5–T and that dioxin was suspected as the contaminant.

The government's responding papers make clear its good faith efforts to locate the PHS documents which defendants requested. The government searched NIOSH (National Institute of Occupational Safety & Health) which had taken over the program functions of The Bureau of State Services and the Bureau of Occupational Safety and Health, both former PHS bureaus. Also, NIOSH contacted current NIOSH branches which might be expected to have the requested documents—The Office of Administrative Management Services, The Hazard Evaluations and Technical Assistance Branch (HETAB) and The Industrial Hygiene Section. No PHS documents from the 1960's were found. Also searched were the Industrywide Studies Branch and the Division of Behavioral and Biological Sciences. NIOSH also contacted employees and followed their leads. Following one such lead, another search of HETAB turned up information responsive to Request # 1(c) concerning the dermatoses investigation at Diamond Alkali Company in 1963. (See "PHS" List of Requests attached hereto as Appendix B). The government is currently reviewing these documents and will produce them.

The government's papers satisfy me that its search for former PHS files in NIOSH was thorough. Indeed, defendants conceded as much at the oral argument. (See Transcript of Hearing of May 3, 1983, at 4829). Accordingly, I will deny that part of defendants' motion which would require the government to duplicate its efforts.

Pursuant to my direction with respect to Defendants' Motion for an Order to Compel NCI/Bionetics Documents, the government has just completed a search of the files at the high levels of the Department of Health and Human Services (formerly HEW), of which PHS is a part. The government searched the Surgeons General and Assistant Secretaries of Health files as well as those of the Secretaries and Under-Secretaries of HEW during the time period relevant to this litigation. At oral argument, the government represented that Surgeons' General files yielded three documents which fell within the criteria used for the search. For a discussion of these criteria, see pp. 527–528 *supra*. The government is directed to expedite its review of these documents and

 to produce forthwith all relevant documents.

### IV. *Defendants' Motion to Compel Production of Department of Agriculture Documents*

 In their motion to compel production of Department of Agriculture ("USDA") documents, defendants request that the Pesticide Registration Division ("PRD") of USDA produce its Central Toxicity files on 2,4,5–T and other compounds which were registered pursuant to the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"). FIFRA registrations were maintained in the Central Toxicity files in the folders with chemical and toxicity data. In 1970, the then newly created Environmental Protection Agency ("EPA") acquired the files of PRD. However, EPA's production of documents in this litigation[5] did not include the documents which are the subject of the instant motion. At oral argument on May 9, 1983, the government represented that those product registrations made pursuant to FIFRA which had been cancelled prior to 1970 are located in the EPA archives in Maryland, and are not readily segregable. After a discussion between the parties and the Special Master about how to gain access to this material, each of the defendants was directed to provide EPA with the dates of its own product registration cancellations. The government will contact EPA to determine if the requested archive material can be located through use of cancellation dates, as suggested by one of the defendants' counsel.

Defendants also seek PRD's Safety Evaluation files and Inspection Services Accident and Investigative files. The government represents that to the extent EPA has records of this information, the files are in the possession of the University of Miami School of Medicine, where they were sent by EPA for use in the University's Pesticide Incident Monitoring System. Pursuant to my direction, the government contacted the University of Miami School of Medicine to determine if these files are still extant. It determined that the files do exist and will be produced.

Finally, regarding user complaints from the Forest Service, at oral argument, the defendants dropped this request from their motion in view of the government's representation that a thorough search for this material had been conducted and nothing had been found.

### V. *Defendants' Motion for an Order to Compel Production of Department of Defense Documents*

 Of the 34 requests which were the subject of Defendants' Motion for an Order to Compel Production of Department of Defense documents (see Department of Defense List of Requests, attached hereto as Appendix D), ten had been resolved as of the time of oral argument on May 9, 1983. (Items # 7,8,9,10,11,14,15,21,22 & 23). The status of the remaining twenty-four items is as follows:

Requests # 1–4 concern files of the Army Surgeon General. The government contends that these documents have not been requested before, and, therefore, are improper in a Rule 37 motion. Further, it argues that the requests contain no temporal limitations and are therefore over broad, and, that to require the government to search pursuant to such requests would be oppressive. Finally, with respect to those documents covered by Item # 4, the government indicates that they were on the TWIX inventories which the government supplied to the parties in 1981 and production of which the Special Master denied on the grounds that defendants unduly delayed requesting documents from the TWIX inventories (see Pretrial Order No. 50 affirming the Special Master's oral ruling on April 6, 1983). To compel production of these documents, the government argues, would be to condone defendants' subversion of the Special Master's TWIX order by allowing

---

**5.** Production of EPA documents occurred in January and February of 1983 following Judge Pratt's approval on January 13, 1983 of the Special Master's Recommended Protective Order Governing Environmental Protection Agency Documents. *See* 96 F.R.D. 578 (E.D.N.Y. 1983).

them to get TWIX documents through the backdoor of a motion to compel. Item # 4 is denied. Counsel for the defendants are directed to meet with government counsel and review Items # 1–3 and attempt to narrow these requests. If agreement is not reached, a further review by the Special Master will be held expeditiously.

Items # 5 and # 6 request documents from the files of the Surgeon General of the Air Force. Again, the government argues that these are new requests, improper in a motion to compel and too broad. Here, too, counsel are requested to meet and seek to resolve the motion without delay.

Defendants' request for relevant material from Dr. Summerson's files is denied (see Item # 19). With respect to Item # 20, the government is directed to search for Dr. Summerson's trip report describing his trip to Vietnam in the mid-1960's.

The government is also directed to search for and produce, if available, the trip reports of Robert Cox and John Gerety (see Item # 24). Regarding Item # 25, the government will determine and report whether a search has already been conducted for the Weldon Springs project material.

Items # 26 through # 30 requesting documents relating to the riot control agent "CS" are denied pursuant to my April 14, 1983 ruling that this material is not relevant to this case.

Defendants have dropped their requests for Items # 13, 16 and 17 in light of the government's representation that a search for this material had been conducted and nothing was found.

Finally, regarding Items # 31 and # 32 which request Chemical Corps Board material, the government represented at oral argument that its search has been completed and the Department of Justice has sent the documents for microfilming.

## VI. Defendants' Request for National Security Agency Document Production

For over a year now, the parties and the government have been actively engaged in discovery on the issues involved in the Phase I trial of this case. On March 25, 1983, defendant-Dow Chemical Company requested, for the first time, government production of documents from the National Security Agency ("NSA"). This request contained broad demands, seeking, for example, documents which relate to research, development, evaluation and testing of herbicides for military purposes, communications between NSA and certain departments of the Army and/or Department of Defense, among others, which refer to dioxin, 2,4,5–T, etc., and organization charts of the NSA (See NSA List of Requests attached hereto as Appendix E). At the April 4, 1983 hearing, the Special Master requested that defendants state the basis for this new area of inquiry. (See Transcript of Hearing before the Special Master, April 4, 1983 at 3868). On April 14, 1983, defendants responded at a hearing before the Special Master that they had subpoenaed documents from the Institute of Defense Analysis ("IDA") (a non-governmental agency) on March 9, 1983. In the course of this discovery, defendants learned that IDA had done work for NSA, although they have no evidence that this work was in any way related to herbicides.

In its papers opposing defendants' request, the government outlines the responsibilities of NSA and argues that it was unreasonable to expect that any contacts IDA might have had with NSA related in any way to the issues in this litigation. According to the government's memorandum, NSA monitors foreign electromagnetic signals in order to provide data to the United States' intelligence operations; it also attempts to protect United States' communications from the intelligence activities of foreign powers. The government argues that the likelihood of NSA having documents relevant to this case is remote and that in view of NSA's complicated filing system, to require a search on such paltry grounds as the defendants present would be oppressive and unduly burdensome.

At a hearing on May 9, 1983, defendants presented another basis for their discovery requests on NSA. As part of their preparation of this case, defendants made a re-

quest, dated February 17, 1982, on the CIA pursuant to the Freedom of Information Act ("FOIA") for (1) all documents relating to the Pacific Architects Engineers and/or Philo Ford that pertained to herbicide or pesticide usage in Southeast Asia prior to 1971 and for (2) all documents pertaining to pesticide and/or herbicide usage dated prior to 1970. See Affidavit of Leonard L. Rivkin, submitted in support of Dow Chemical Company's Motion for a *Vaughn* Itemization, dated November 23, 1982. The CIA located three documents which its searchers determined to be responsive to defendants' FOIA request. These three documents originated at NSA, and were returned to them for review. Defendants now argue that these three documents are evidence that NSA has in its possession other documents which are relevant to this litigation, and accordingly justify their recent discovery requests.

I am not at this time convinced that NSA, considering the nature of its sensitive responsibilities, would possess documents relevant to this litigation which were not already in the files of other governmental agencies. However, a recommendation on this request will be reserved pending Judge Pratt's review of the three documents under the FOIA request. (See *Rivkin, Leff, Sherman & Radler v. Central Intelligence Agency, Department of Agriculture and Department of Defense,* CV No. 82–3721). If pursuant to his review under FOIA, Judge Pratt directs that the CIA must produce these documents, then defendants may submit those documents to me to bolster their argument that discovery on NSA is justified. If, however, the Judge finds that these documents need not be produced under FOIA, then absent any other showing, I will deny defendants' request for production of NSA documents on the grounds that such discovery would be outside of the zone of relevancy and therefore burdensome.

## APPENDIX A

### NCI BIONETICS LIST OF REQUESTS

1. All contracts, and any and all supplements or modifications thereto, between the United States or NCI and Bionetics for the study of carcinogenicity and/or teratogenicity of various compounds, including but limited to the contract executed in 1963 pursuant to which a report titled "Evaluation of Carcinogenic, Teratogenic and Mutagenic Activities of Selected Pesticides and Industrial Chemicals" was prepared.

2. Any periodic reports, interim reports, final reports, correspondence or reports or memoranda of any description by Bionetics to NCI or any other agency, or by NCI or any other agency of the United States Government to any other agency or person, that mention test results or findings by Bionetics pertaining to 2,4,-5–T and/or its possible hazards, including teratogenicity.

3. All documents that relate to the selection of 2,4,5–T for study by Bionetics, including but not limited to all reports, notes or memoranda of any meetings, formal or informal, within or outside NCI on the subject of possible hazards, including teratogenicity, of 2,4,5–T.

4. All files in the possession of Bionetics or NCI that contain research information or publications on 2,4,5–T, 2,4,5–TCP, any dioxin or chloracne.

5. All documents prepared in the course of the Bionetics study that mention 2,4,5–T, 2,4,5–TCP, any dioxin or chloracne.

6. All documents that relate to or evidence the dissemination of information developed in the course of the Bionetics research concerning any potential hazard of 2,4,5–T, including but not limited to notes, lists or documents of any description indicating to whom and when any data, information, results, drafts or versions of the Bionetics reports were disseminated.

7. All notes, memoranda and correspondence, from NCI employees to Bionetics employees, and from Bionetics employees to NCI employees, that pertain to the Bionetics study, including but not limited to transmittal letters accompanying reports, data or other correspondence or

documents submitted by Bionetics to NCI or by NCI to Bionetics.

8. All notes, memoranda, correspondence or documents of any description that relate to meetings, discussions or communications—formal or informal—held from 1960 to 1970 and attended by Bionetics employees, NCI employees, or any other representatives of any government or private entity, at which the Bionetics study was discussed or mentioned.

9. All LD–50 reports and/or other reports on the toxicology and/or chemistry of 2,4,5–T prepared in connection with the Bionetics study.

10. All written protocols, including the Food and Drug Administration Phase II teratology protocol, utilized or consulted in the course of the Bionetics study.

11. All documents relating to Dr. Courtney's attendance at any workshops, conferences, meetings or seminars concerning teratology, including but not limited to all notes pertaining to Dr. Courtney's trip to Canada and meetings with Canadian scientists in which 2,4,5–T, 2,4,5–TCP, any dioxin or chloracne was mentioned.

12. Personal records of Dr. Baker relevant to 2,4,5–T.

13. Minutes, notes or memoranda of meetings, or referring to meetings, of NCI directors where 2,4,5–T, 2,4,5–TCP, any dioxin or chloracne was discussed.

14. Records of meetings, attended by FDA scientists and Dr. Baker.

15. Bound compendiums of studies of chemical compounds for carcinogenicity published by and/or in possession of United States Public Health Service.

16. Dr. Fishbein's files in the custody of NCI, including but not limited to the literature reviewed in deciding to include 2,4,5–T, in the Bionetics study, and notes or literature received at a toxicology meeting in Atlanta on 3/12/70 attended by Dr. Fishbein.

## APPENDIX B

### PHS LIST OF REQUESTS

1. All files presently or once maintained at the USPHS facility in Cincinnati, Ohio which relate to chloracne. Identified during the deposition of Dr. Paul Possick, 1/3/83. Included in these files were the following specific items:

a. Kimmig and Schulz, "Occupational Chloracne Caused by Aromatic Cyclic Ethers", 1947. Identified at the Possick deposition, 1/3/83.

b. Bleiberg, et al., "Industrially Acquired Porphria", 1964. Identified at the Possick deposition, 1/3/83.

c. Dermatoses Investigation, Diamond Alkali Company, Newark, New Jersey, conducted by Birmingham and Key, 1963. Identified during the Key deposition, 7/8/83.

d. Jones and Krizek, "A Technic for Testing Acnegenic Potency in Rabbits, Applied to the Potent Acnegen, 2,3,7,8–Tetrachlorodibenzo–P–Dioxin", 1962. Identified at the Possick deposition, 1/3/83.

e. Birmingham and Key, Presentation to the International Congress on Occupational Health, 1966. Identified during the Key deposition, 7/8/82.

f. Schwartz, "An Outbreak of Halowax Acne (Cable Rash) Among Electricians", 1943. Identified at the Possick deposition, 1/3/83.

g. Letter from Dr. Davis W. Goldstein to Dr. Key, dated November 28, 1962. Identified at the Key deposition, 7/8/82.

h. Letter from Dr. Davis W. Goldstein to Dr. Key, dated December 17, 1962. Identified at the Key deposition, 7/8/82.

i. Letter from Dr. Key to Dr. Davis W. Goldstein, dated March 27, 1963. Identified at the Key deposition, 7/8/82.

j. Letter from Dr. Davis W. Goldstein to Dr. Key, dated April 5, 1963. Identified at the Key deposition, 7/8/82.

k. Poland, et al., "A Health Survey of Workers in a 2,4,–D and 2,4,5–T Plant: With Special Attention to Chloracne, Porphyria Cutonea Tarda and Psycho-

logic Paremeters", 1969. Identified at the Possick deposition, 1/3/83.

2. "Chloracne Study (George Lawton)", 1964. Identified during the deposition of Dr. Lawton, 1/27/83.

3. Report prepared by Dr. Groth, "Microscopic Changes in Rabbits, Secondary to Application of Various Pesticides T. Their Ears", 1964. Identified at the Groth deposition, 7/20–21/82.

4. Letter from Dr. Groth to E.T. Upton, dated December 3, 1964. Identified at the Groth deposition, 7/20–21/82.

5. Letter from Edwin T. Upton to Dr. Groth, dated December 11, 1964. Identified at the Groth deposition, 7/20–21/82.

6. Letter from Edwin T. Upton to Dr. Groth, dated January 14, 1965. Identified at the Groth deposition, 7/20–21/82.

7. Project Development and Approval form, titled "Identification of the Toxic factor in 2,4,5 trichlorophenoxyagetic acid (2,4,5–T)", with attached protocols. Identified at the Groth deposition, 7/20–21/82.

8. The agendas from USPHS staff meetings held at the Cincinnati facility from the years 1952–1964. Identified at the Birmingham deposition, 8/26–27/82.

9. Any dermatoses investigation reports made by any USPHS employee relating to 2,4,5–T, dioxin or chloracne.

10. Any documents, including all correspondence, relating to herbicides, 2,4,5–T, TCDD, or chloracne prepared or received by the USPHS prior to 1971, and this specifically includes the USPHS facility in Cincinnati, Ohio, the office of the Chief of the Division of Occupational Health, located in Washington, D.C., and the Bureau of State Services, also located in Washington, D.C.

## APPENDIX C

### USDA LIST OF REQUESTS

1. Files maintained by the USDA, PRD on 2,4,5–T, including but not limited to the "Central Toxicity File." (Requested by defendants by letter from M. Neiman to A. Maskin, dated March 7, 1983).

2. Pesticide registration records transferred from USDA to EPA in or about 1969, including but not limited to any objections made by governmental entities including the USPHS. (Requested by defendants by letters from M. Gordon to J. Bernott, dated March 11 and April 26, 1983).

3. Correspondence and documents in or from the files of the Safety Evaluation Section of the PRD relating to 2,4,5–T, chloracne or dioxin. (Requested by defendants at the deposition of Dr. Harry W. Hays, Tr. at 49–51, 140).

4. Correspondence and documents in or from the files of the Inspection Services Accident and Investigation Section of the PRD relating to 2,4,5–T, chloracne or dioxin, including but not limited to any such correspondence and documents contained in the files of Mr. Dellaviccia during his association with that section. (Requested by defendants at the deposition of Dr. Harry W. Hays, Tr. at 63–65, 140).

5. USPHS Clearinghouse for Poison Control Centers' March–April 1966 or 1968 (date unclear) Bulletin headlined "Deaths from Chlorinated Phenoxyacetic Acids (2,4–D; 2,4,5–T; MCPA)." (*See* Deposition of Dr. Harry W. Hays, Tr. at 84,86).

6. Those documents and correspondence of the U.S. Forest Service which refer to health effects associated with the use of 2,4,5–T, including but not limited to any incidents involving chloracne noted in documents prepared and received by the Forest Service in Ozark, Arkansas. (Requested by defendants by letters from M. Gordon to J. Bernott, dated March 11, 1982, May 27, 1982 and June 18, 1982. *See* Notice To All Counsel, dated February 23, 1983).

## APPENDIX D

### DEPARTMENT OF DEFENSE LIST OF REQUESTS

1. Documents in the possession of the Army Surgeon General, especially the Research and Development Division, per-

taining to contract number VA–49–007–MD–411 with the Department of Dermatology of the University of Chicago. (Requested by defendants by letter from M. Gordon to J. Bernott, dated March 11, 1982).

2. Documents in the possession of the Headquarters of the Army Surgeon General relating to the Army Environmental Hygiene Agency's work on the restriction of the use of herbicides around water supplies. (Requested by defendants by letter from M. Gordon to J. Bernott, dated March 11, 1982).

3. Documents in the possession of the Preventative Medicine Division of the Army Surgeon General pertaining to its July 22, 1966 request to the National Academy of Sciences for toxicity information on 2,4,5–T and other herbicides. This request includes any information sent to the Preventative Medicine Division by the National Academy of Sciences and documents in the possession of the Army Surgeon General Headquarters relating to this request. (Requested by defendants by letter from A. White to A. Maskin, dated March 28, 1983).

4. Documents in the possession of the Army Environmental Hygiene Agency and/or the Army Surgeon General Headquarters pertaining to AEHA's recommendations on the proposed military specification MIL–H–51310, herbicides, N–butyl esters, concerning a precautionary label on the product. AEHA transmitted its recommendation on December 9, 1968.

5. Documents in the possession of the Command Surgeon of the Air Force Logistics Command and the Headquarters of the Air Force Logistics Command pertaining to reports from Dr. Walter Melvin or his Agency concerning the results of evaluations of herbicides.

6. Documents in the possession of the Surgeon General of the Air Force pertaining to work at Eglin Air Force Base on evaluations of herbicides.

7. The "approximately 90 documents" described in the Government's Response to Defendants' Interrogatories and Notice to All Counsel dated April 15, 1981, which were generated by the Commerce Department in connection with its responsibilities under the Defense Production Act. (See letter from M. Gordon to J. Bernott, dated May 4, 1981).

8. Correspondence and documents relating to the production of 2,4,5–T and explosions in manufacturing plants in the United States, and more specifically, a May 1, 1967 letter in which BDSA advised DGSA that "the production of 2,4,5–T is more complex and more dangerous than the production of 2,4–D and in recent years several U.S. plants have exploded." (Requested by defendants by letter from M. Gordon to J. Bernott, dated May 4, 1982).

9. Correspondence and documents in the files of the DGSA concerning the procurement of 2,4,5–T from "off-shore sources," including materials which indicate familiarity with incidents of chloracne of knowledge concerning the dioxin assays of foreign manufacturers.

10. All documents referring or relating to compound 125413, including the name of the source of that compound. (See letters from M. Gordon to A. Maskin, dated November 23, 1982 and March 14, 1983, and Notice to All Counsel, dated March 30, 1983).

11. Documents showing the identity of the source who submitted CS 66422 to the Army Chemical and Medical Research Laboratories' Industrial Liaison Office. (See Letter from M. Gordon to A. Maskin, dated March 14, 1983, and Notice to All Counsel dated March 30, 1983).

12. Classified paper on use of herbicides, presented by Gen. F. Delmore at April 26, 1963 meeting at Edgewood Arsenal. (Requested by defendants at deposition of Gen. F. Delmore, Tr. at 99, and by letter from P. Tuohy to A. Maskin, dated February 16, 1983).

13. Copy of volume containing results of toxicological studies by Dr. B. McNamara, which was transmitted by him to various government officials in or about 1962 or 1963 (including the names of the

officials). (Requested by defendants at deposition of W.C. Shaw, Tr. at 279, and by letter from J. Burke to A. Maskin, dated February 1, 1983).

14. All relevant material responsive to defendants' First Wave Interrogatories dated January 15, 1981 and to the subpoena to the United States Army Chemical Systems Laboratory, dated May 17, 1982 from the personal files of F. Vocci, including, but not limited to: (a) notes of F. Vocci pertaining to a meeting of the medical panel for NATO held at WRAIR: (b) handouts and minutes distributed at an earlier meeting at WRAIR: and (c) list of names of those responsible for distributing minutes of NATO meeting. Vocci stated during his deposition that these materials are in his possession and that he is willing to supply them for production. (Requested by defendants at the deposition of Frank Vocci, Tr. at 12–13, and by letter from S. Pierce to A. Maskin, dated December 6, 1982).

15. The film, "The CRDL Story," and other films relating to research done at Edgewood Arsenal, including rabbit ear tests and methods of introduction of toxic substances. (Requested by defendants at the deposition of F. Vocci, Tr. at 31, and by letter from S. Pierce to A. Maskin, dated December 6, 1982).

16. Reports relating to herbicides, dioxins or furans sent to F. Vocci upon completion of "task force" projects. (Requested by defendants at the deposition of F. Vocci, and by letter from S. Pierce to A. Maskin, dated December 6, 1982).

17. Data books of Dr. B. McNamara, C. Punte, F. Vocci or others relating to testing with respect to toxicity of herbicides, dioxins or furans. (Requested by defendants at the deposition of F. Vocci, Tr. at 204, and by letter from S. Pierce to A. Maskin, dated December 6, 1982).

18. Tables of organization, or lists with specific names, of those assigned at Edgewood Arsenal to the position of Branch Chief and above during the 1960's. (Requested by defendants at the deposition of F. Vocci, Tr. at 217, and by letter from S. Pierce to A. Maskin, dated December 6, 1982).

19. All relevant material responsive to defendants' First Wave Interrogatories dated January 15, 1981 and to the subpoena to the United States Army Chemical Systems Laboratory dated May 17, 1982, from the personal files of Dr. William A. Summerson. (Requested by defendants at the deposition of Dr. Summerson, Tr. at 10, and by letter from J. Mariani to A. Maskin, dated April 5, 1983).

20. The Trip Report prepared by Dr. Summerson describing his trip to Vietnam in the mid-1960's. (Requested by defendants at the deposition of Dr. Summerson, Tr. at 83, and by letter from J. Mariani to A. Maskin, dated April 5, 1983).

21. Complete copies of those articles from the reprint files of Dr. B. McNamara that contain any underlining or annotation and which were assigned the following identifying numbers by Lester Miller: 5924, 5985, 6087, 6178 and 6636. (Requested by defendants at the deposition of L. Miller, Tr. at 119, and by letter from M. Gordon to A. Maskin, dated December 6, 1982).

22. All copies of test results for any dioxin, 2,4,5–T or trichlorophenol compound which are located in the former files of the Toxicity Screening Branch, including all 8½″ by 10″ data sheets that were prepared for those compounds. (Requested by defendants at the deposition of L. Miller, Tr. at 51, 53 and 141, and by letter from M. Gordon to A. Maskin, dated December 6, 1982).

23. The group of documents entitled "Follow-up Production: Sim, Miller, Cox, Callahan depositions and CSL New Find," designated by the government as Batch No. 1968. (See Notice to All Counsel, dated February 23, 1983).

24. Trip Reports of visits by Sigmund Eckhaus, Robert E. Cox, John Gerety and others from the Weapons Development and Engineering Laboratory at Edgewood Arsenal to commercial 2,4,5–T and trichlorophenol plants in connection with the project to create a government facility for the production of Agent Orange.

(Requested by defendants at the deposition of Sigmund Eckhaus, Tr. at 94–95, and at the deposition of Robert Cox, Tr. at 146, and by letter from E. Matthews to A. Maskin, dated October 28, 1982).

25. The "Weekly Significant Action Reports", "minutes of all meetings", and "special reports", which the Commodity Manager for the Weldon Springs project was required to prepare and distribute under the terms of his Charter. (Requested by defendants at the deposition of William W. Stone, Jr., Tr. at 144).

26. All documents relating to any incidents involving skin disorders, including chloracne, among producers of the Anti-Riot Agent "CS" at Edgewood Arsenal, including all "after-action" reports which were filed or prepared as a result of any such incidents. (Requested by defendants by letters from S. Pierce to A. Maskin and from E. Matthews to A. Maskin, dated October 1, 1982 and October 28, 1982, respectively).

27. All documents relating to health effects among producers and/or users of "CS", including all medical records or other documents concerning treatment of any Edgewood Arsenal employees or others affiliated with chloracne or skin disorders. (Requested by defendants by letters from S. Pierce to A. Maskin and from E. Matthews to A. Maskin, dated October 1, 1982 and October 28, 1982, respectively).

28. All copies of records pertaining to "CS" which have been transferred to civilian manufacturers of "CS", including the Fisher Chemical Company, Brunswick and Thyocol Chemical Companies and Federal Laboratories. (Requested by defendants by letter from E. Matthews to A. Maskin, dated October 28, 1982).

29. All documents which refer to research activities to determine the cause or causes of health effects among producers or users of "CS". (Requested by defendants by letter from S. Pierce to A. Maskin, dated October 1, 1982).

30. All documents relating to the synthesis or production of "CS" and any precursors, intermediates and raw materials used in its production. (Requested by defendants by letter from S. Pierce to A. Maskin, dated October 1, 1982).

31. Minutes of meetings of the Chemical Corps Board relating to dioxin, 2,4,5–T, Agent Purple, Agent Orange or the Hoffmann Trip Report for the period 1955–1970. (Requested by defendants by letter from P. Tuohy to A. Maskin, dated February 16, 1983).

32. All documents of the Chemical Corps Board relating to dioxin, 2,4,5–T, Agent Purple, Agent Orange or the Hoffmann Trip Report for the period 1955–1970. (Requested by defendants by letter from P. Tuohy to A. Maskin, dated February 16, 1983).

33. Written notes and reports prepared by Dr. F. Morthland in connection with the meeting held to discuss and evaluate the toxicity of 2,4–D and 2,4,5–T compounds at Edgewood Arsenal on April 26, 1963, and the meeting of the President's Science Advisory Committee on May 9, 1963. (Identified at the deposition of F. Morthland, Tr. at 64–65, and requested by defendants by letter from W. Heck to A. Maskin, dated March 14, 1983).

34. All documents relating to dioxin, 2,4,5–T, Agent Purple, Agent Orange or the Hoffmann Trip Report (including the Report itself) in the files of the Army Research Office, and any predecessor or successor office, prepared prior to 1970. (Identified at the deposition of F. Morthland, Tr. at 64–65 and 105, and requested by defendants by letter from W. Heck to A. Maskin, dated March 14, 1983).

APPENDIX E

NSA LIST OF REQUESTS

1. All documents that refer or relate to proposed research, development, testing, evaluation, toxicity, or use of herbicides for military purposes, including but not limited to 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt, or other form thereof including Agents Orange, Pink, Purple, and Green.

2. All documents that refer or relate to research, development, testing, evaluation, toxicity, or use of herbicides for military purposes, including but not limited to 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt, or other form thereof including Agents Orange, Pink, Purple, and Green.

3. All documents not called for in response to paragraphs 1 or 2 relating to any communication to or from Edgewood Arsenal which refer or relate to dioxin, trichlorophenol, 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including Agents Orange, Pink, Purple and Green.

4. All documents not called for in response to paragraphs 1 or 2 relating to any communication to or from Fort Detrick which refer or relate to dioxin, trichlorophenol, 2,4,5-trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including Agents Orange, Pink, Purple and Green.

5. All documents not called for in response to paragraphs 1 or 2 relating to any communication to or from the Advanced Research Projects Agency ("ARPA") which refer or relate to dioxin, trichlorophenol, 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including Agents Orange, Pink, Purple and Green.

6. All documents not called for in response to paragraphs 1 or 2 relating to any communication to or from the Institute for Defense Analyses (including but not limited to all communications to or from J.H. Coates, L.M. Sharpe, H. Pollack, S.S. Penner, Robert J. Heaston, J.R. Ruina, S.J. Deitchman, or any agent, employee or representative of the Institute for Defense Analyses or any predecessors or successors thereof), which refer or relate to dioxin, trichlorophenol, 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including Agents Orange, Pink, Purple and Green.

7. All documents not called for in response to paragraphs 1 or 2 relating to any communication to or from the Office of the Secretary of Defense which refer or relate to dioxin, trichlorophenol, 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including Agents Orange, Pink, Purple and Green.

8. All documents not called for in response to the preceding paragraphs which refer or relate to dioxin, trichlorophenol, 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including Agents Orange, Pink, Purple and Green.

9. All copies of studies, reports, publications and other literature which refer to or relate to dioxin, trichlorophenol, 2,4,5–trichlorophenoxyacetic acid, or an ester, amine, salt or other form thereof, including but not limited to any of the following:

(a) Kimmig, J., Schulz, K.H.: Chlorierte aromatische Zyklische Ather als Ursache der sogenannten Chlorakne, Naturwissenschaften 44,337–338 (1957), or an English or other translation thereof;

(b) Kimmig, J., Schulz, K.H.: Berufliche Akne (sog. Chlorakne) durch chlorierte aromatische Zyklische Ather, Dermatologica 115, 540–546 (1957), or an English or other translation thereof;

(c) Schulz, K.H.: Klinische und experimentelle Untersuchungen zur Atiologie der Chloracne, Arch. Klin. Exp. Dermatol. 206,589–596 (1957), or an English or other translation thereof;

(d) Bauer, H., Schulz, K.H., Spiegelberg, U.: Berufliche Vergiftungen bei der Herstellung von Chlorphenol-Verbindungen, Arch. Gewerbepathol. Gewerbehyg. 18,538–555 (1961), or an English or other translation thereof;

(e) Sandermann, W., Stockmann, H., Casten, R.: Uber die Pyrolyse des Pentachlorphenols, Chem. Ber. 90,690–692 (1957), or an English or other translation thereof;

(f) Bleiberg, J., Wallen, M., Brodkin, R., Appelbaum, I.L.: Industrially acquired porphyria, Arch. Dermatol. 89,-793–797 (1964); and

(g) Jones, E.L., Krizek, H.: A Technic for Testing Acnegenic Potency in Rabbits, Applied to the Potent Acnegen, 2,3,-7,8–Tetrachlorodibenzo–P–Dioxin, Journal of Investigative Dermatology 511 (1962).

10. All organization charts for each division, branch, section and other unit of the National Security Agency and all predecessors or successors thereto from January 1, 1956 to January 1, 1972.

11. All documents not called for in response to the preceding paragraphs that are responsive to Defendants' Phase I First Wave Interrogatories (First Set) dated January 15, 1981 (Exhibit A hereto), but which have not yet been produced to the parties by the United States of America in In re "Agent Orange" Product Liability Litigation, MDL No. 381. This request incorporates by reference the definitions and instructions contained in Exhibit A hereto, including, in particular definitions of· "dioxin", "herbicide", and "document".